[Cite as *In re Estate of Weiner*, 2019-Ohio-2354.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF JOEY WEINER | : | |
| | : | |
| | : | Appellate Case No. 27278 |
| | : | |
| | : | Trial Court Case No. 1998 EST 322246 |
| | : | |
| | : | (Appeal from Common Pleas Court, Probate Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of June, 2019.

. . . . . . . . . . .

DAVID P. WILLIAMSON, Atty. Reg. No. 0032614 and JUSTINE Z. LARSEN, Atty. Reg. No. 0095525, 6 North Main Street, Suite 400, Dayton, Ohio 45402
 Attorneys for Appellant/Cross-Appellee, Harry Weiner

DAN D. WEINER, Atty. Reg. No. 0008179, 4848 Marshall Road, Kettering, Ohio 45429
 Appellant/Cross-Appellee, pro se

ROBIN D. MILLER, Atty. Reg. No. 0074375, 600 Vine Street, Suite 2800, Cincinnati, Ohio 45202
 Attorney for Appellee/Cross-Appellant, the Estate of Joey Weiner

. . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Appellants and cross-appellees, Dan Weiner and Harry Weiner, appeal from the final judgment of the Montgomery County Court of Common Pleas, Probate Division (the "Probate Court") entered on August 30, 2016. Raising four assignments of error, Dan Weiner argues that the Probate Court erred: (1) by finding that a substantial quantity of documents he requested in discovery from the Estate of Joey Weiner (the "Estate") was protected by attorney-client privilege; (2) by finding that the executor could require a release of liability as a condition of voluntarily resigning; (3) by approving the Estate's payment of attorney's fees incurred by the executor without having determined whether the corresponding services were beneficial to the Estate; and (4) by regulating the proceedings at a hearing on his exceptions to the Estate's sixth account such that his right to due process was violated. Raising two assignments of error, Harry Weiner argues that the Probate Court erred by authorizing the Estate to pay attorney's fees incurred by the executor for services that were not beneficial to the Estate, and conversely, that the Probate Court erred by refusing to authorize the Estate to pay attorney's fees that he himself incurred in challenging the fees incurred by the executor. For its part, the Estate—the appellee and cross-appellant—raises a single cross-assignment of error in which it argues that the Probate Court erred by authorizing payment of only a portion of the attorney's fees incurred by the executor, rather than the full amount for which the executor requested approval in the Estate's application of August 25, 2010.

**{¶ 2}** We find that Dan Weiner has not satisfied his burden on appeal to demonstrate that the Probate Court erred in its resolution of his discovery disputes with the Estate. Further, we find that the Probate Court did not err by holding that the

executor could demand a release of liability in exchange for his voluntary resignation; that the Probate Court did not violate Dan's right to due process at the hearing on his exceptions to the Estate's sixth account; and that the Probate Court did not err by overruling Harry Weiner's application for payment of his attorney's fees. Regarding the Estate's application for payment of attorney's fees, however, we find that the Probate Court erred when it summarily denied the Estate authorization to pay any fees incurred by the executor after June 22, 2005. Therefore, the Probate Court's judgment of August 30, 2016, is affirmed in part and reversed in part, and the case is remanded for additional proceedings consistent with this opinion.

## I. Facts and Procedural History

{¶ 3} Joey Weiner died on May 27, 1998. In her will, she made her three sons, Dan Weiner, Harry Weiner and Ted Weiner, the beneficiaries of the Estate, and she nominated Ted to serve as executor. Other than Dan, Harry and Ted, Ms. Weiner left no survivors who would have been entitled to inherit under the statute of descent and distribution.[1]

{¶ 4} Having engaged his brother, Dan, to represent him in his capacity as executor of the Estate, Ted Weiner filed an application on June 4, 1998, for the admission of his mother's will to probate, along with an application for authority to administer the Estate. Both of the applications were granted by the Probate Court on the day they were filed. Ted thereafter submitted the Estate's first account on June 11, 1999, covering the

---

[1] Ms. Weiner seems to have had one or more living grandchildren when she died, though none of them would have been entitled to inherit under the statute of descent and distribution because her three children also survived her. *See* R.C. 2105.06(A); Complaint, Montgomery C.P. No. 2000 CV 02429 (May 18, 2000), ¶ 10.

period running from May 27, 1998, to April 30, 1999; no attorney's fees or fiduciary fees had been paid at that time. The Probate Court approved the first account on August 27, 1999.

{¶ 5} On May 18, 2000, Dan Weiner initiated a wrongful death action pursuant to R.C. 2125.01 by filing a complaint in the Montgomery County Court of Common Pleas. The complaint, in Case No. 2000 CV 02429, identified Ted Weiner—in his capacity as the executor of the Estate—as the plaintiff, and a nursing home and a physician as the defendants.

{¶ 6} On June 20, 2000, in response to an "oral motion [made by] Ted Weiner," the Probate Court entered an order in which it substituted C. Terry Johnson, an attorney with the firm of Porter, Wright, Morris & Arthur ("PWMA"), to act as attorney for the executor in place of Dan Weiner, whom Ted had dismissed. Entry Substituting Counsel 1, June 20, 2000. One week later, Ted filed the Estate's second account, covering the period running from May 1, 1999, through April 28, 2000; again, no attorney's fees or fiduciary fees had yet been paid. The Probate Court approved the second account on August 1, 2000.

{¶ 7} Effective August 24, 2000, Johnson replaced Dan Weiner as the plaintiff's attorney in the wrongful death action. By that time, both of the defendants had filed answers to the complaint, but none of the parties had filed any further pleadings or motions. At a pretrial hearing, held on January 19, 2001, the common pleas court scheduled a jury trial to begin in February of the following year.

{¶ 8} Ted and Dan, meanwhile, seem to have been embroiled in an ongoing dispute regarding the administration of the Estate in general, and the handling of the

wrongful death action in particular, as Ted's dismissal of Dan suggests. *See, e.g.*, Entry and Order Overruling Dan Weiner's Motion for Removal of Ted Weiner 1-2, Aug. 6, 2002; Exceptor's Exhibits 11-12, Sept. 10, 2003.[2] In a letter dated March 26, 2001, Ted offered to resign as executor in favor of Dan on condition that Dan and Harry execute a release relieving him of any liability arising from his management of the Estate's affairs. *See* Exceptor's Exhibit 9, Sept. 10, 2003; Entry and Order Overruling Dan Weiner's Motion for Removal of Ted Weiner 1-2. According to the terms of the proposed release, each of the three siblings would have "release[d] [the others] from, and agree[d] to indemnify [the others] against," all liability "arising from the administration of the Estate of Joey Weiner."[3] *See* Exceptor's Exhibit 9, Sept. 10, 2003. The release was not executed, and Ted continued to serve as executor.

{¶ 9} On April 25, 2001, Ted voluntarily dismissed the wrongful death action

---

[2] Dan introduced these exhibits at the hearing on his exceptions to the Estate's fifth account, which began on September 10, 2003, and ended on October 4, 2004.

[3] Harry Weiner had not yet entered an appearance in the case. At oral arguments, Harry's counsel averred that the release would have required his client, and Dan Weiner, to approve the payment of attorney's fees incurred by Ted as executor. Counsel did not mention that Ted submitted two drafts of the proposed release to Dan. Pursuant to what appears to be the first of the two drafts, sent by facsimile from PWMA to Dan on March 1, 2001, Ted and Dan would have "waive[d] [their] right[s] to receive * * * fee[s]" for their respective services as executor of the Estate and counsel for the executor. Exceptor's Exhibit 8, Sept. 10, 2003. During arguments, counsel seems to have been referring to what appears to be the second of the two drafts. Pursuant to the second draft, which was attached to Ted's letter of March 26, 2001, Dan, Harry and Ted would have approved the payment of attorney's fees "to Dan D. Weiner and [PWMA], and [the payment of] executor fees for Ted." Exceptor's Exhibit 9, Sept. 10, 2003. In the letter, Ted also expressed his intention "to split his executor fee with * * * Harry," and added that attorney's fees for Dan and PWMA alike would be paid from the "$60,000 * * * [tax] deduction [for attorney's fees claimed by the Estate] on [Form] 706," the United States Estate (and Generation-Skipping Transfer) Tax Return. *See id.*

pursuant to Civ.R. 41(A). He then filed the Estate's third account on June 26, 2001, which covered the period running from April 29, 2000, to February 23, 2001, as well as an application for authority to pay attorney's fees in the amount of $15,191.18 for the period running from September 17, 1999, to November 30, 2000. On its first page, the third account indicated that no attorney's fees or fiduciary fees had been paid, though the second page listed a disbursement for attorney's fees in the amount of $15,191.18—the same amount specified in the application. Third and Partial Fiduciary's Account 1-2, June 26, 2001; Application for Authority to Pay Attorney's Fees 1, June 26, 2001. The application was granted by the Probate Court on the day it was filed, and the third account was approved on July 31, 2001.

{¶ 10} On March 26, 2002, Dan Weiner notified Ted that he intended to reopen the wrongful death action, in Ted's name, before the expiration of the one-year savings period under R.C. 2305.19. Ted sent a response to Dan on April 2, 2002, in which he indicated that Dan had never been authorized to commence the action; that Dan likewise did not have his permission to reopen the matter; and that he remained willing to resign voluntarily as executor in Dan's favor on condition that Dan and Harry execute the release he had proposed in March 2001. Once again, the release was not executed, and Ted did not resign.

{¶ 11} Ted filed the Estate's fourth account on April 12, 2002, which purported to cover the period running from April 29, 2000, to March 28, 2002, as well as an application for authority to pay attorney's fees in the amount of $15,539.51 for the period running

from December 1, 2000, to June 28, 2001.[4]   No fiduciary fees had been paid, but the account listed a disbursement for attorney's fees in the amount of $15,539.51, the same amount specified in the application.   The application was granted on the day it was filed, and the fourth account was approved on May 13, 2002.

{¶ 12} On June 10, 2002, Dan Weiner moved the Probate Court for Ted's removal as executor, contending that Ted should be removed because he "refused to re-file the [w]rongful [d]eath action in the Montgomery County Common Pleas Court[,] although [asked] to do so."[5]   Application for Removal of Fiduciary 1, June 10, 2002.   The Probate Court overruled Dan's motion in its entry and order of August 6, 2002.   In the order, the Probate Court found that Ted had not violated "any fiduciary duty in his administration" of the Estate; that Ted "was justified in dismissing the wrongful death lawsuit," which "was filed without [his] permission and without the necessary prima facie evidence to support

---

[4] The statement of the fourth account's coverage period appears to have been a mistake. In the Estate's fifth account, filed on April 25, 2003, the fourth account was described as covering the period running from February 24, 2001, to March 28, 2002.   Given that the Estate's third account covered the period running from April 29, 2000, to February 23, 2001, we surmise that the fifth account accurately stated the period covered by the fourth account, and that the fourth account was incorrect in this respect.

[5] Identifying himself as the plaintiff, Dan had filed a second complaint pursuant to R.C. 2125.01 on April 24, 2002.   In the first complaint, Dan had named a nursing home and a physician as the defendants; the second complaint named only the nursing home.   The second complaint's caption-page indicated that it was a "[r]efiling of Case Number [20]00 [CV] [0]2429," which the common pleas court docketed as a new action under Case No. 2002 CV 02672.   On June 24, 2002, the nursing home moved to dismiss the second complaint.   Dan did not respond, and the common pleas court sustained the nursing home's motion on November 20, 2002.   On November 19, 2003, Dan refiled the second complaint, giving rise to Case No. 2003 CV 08442, and on January 18, 2005, Dan again refiled the second complaint, giving rise to Case No. 2005 CV 00425.   The common pleas court sustained Dan's motion to dismiss the complaint in Case No. 2003 CV 08442 on January 15, 2004, and it sustained the nursing home's motion to dismiss the complaint in Case No. 2005 CV 00425 on October 7, 2005.

such a lawsuit"; that Dan "unreasonably and without basis" refused to execute the aforementioned release of liability; and that Ted "had cause to demand a written release" because Dan "had threatened to sue [him] on numerous occasions." Entry and Order 1-2, Aug. 6, 2002.

{¶ 13} After unsuccessfully moving the Probate Court to vacate its order of August 6, 2002, Dan filed two notices of appeal to this court—the first on September 4, 2002, relating to the order, and the second on September 30, 2002, relating to the Probate Court's order overruling his motion to vacate. With these appeals pending, Ted filed the Estate's fifth account on April 25, 2003, covering the period running from March 28, 2002, to March 28, 2003, along with an application for authority to pay attorney's fees. According to the account's list of disbursements, attorney's fees had been paid in the amount of $23,735.13, and fiduciary fees had been paid in the amount of $46,453.00. In the application, Ted requested authority to pay attorney's fees in the amount of $23,547.50 for the period running from November 19, 2001, to October 29, 2002.[6] The application was approved on the date of its filing, but partly as a consequence of Dan's submission of exceptions on May 28, 2003, the fifth account would not be approved for more than a year. On June 27, 2003, we affirmed the orders of the Probate Court in both of Dan's appeals. *In re Estate of Weiner*, 2d Dist. Montgomery Nos. 19533 & 19564,

---

[6] The previous application for authority to pay attorney's fees related to the period running from December 1, 2000, to June 28, 2001. Although the Estate never filed an application for authority to pay attorney's fees for the period running from June 29, 2001, to November 18, 2001, the record suggests that PWMA did not render any billable services during that interval.

2003-Ohio-3408, ¶ 10-14 and 17.[7]

{¶ 14} The Probate Court's hearing on the exceptions to the fifth account began on September 10, 2003. On January 22, 2004, Ted Weiner filed an application for authority to distribute the Estate's remaining assets, averring that he had discharged all of the Estate's obligations other than those owed to the beneficiaries. The Probate Court did not rule on this application, and the hearing on Dan's exceptions to the fifth account was reconvened for a second day on January 30, 2004, for a third day on March 22, 2004, and for a fourth day on July 21, 2004.

{¶ 15} Thirteen months after it began, the hearing was closed at the end of its fifth day, October 4, 2004. A magistrate then issued a decision on November 24, 2004, finding that none of the exceptions had merit and recommending that the fifth account be approved in its entirety. The Probate Court adopted the magistrate's decision on December 8, 2004, but on January 28, 2005, the magistrate filed an amended decision in response to Dan's request for more detailed findings of fact and conclusions of law. On June 20, 2005, the Probate Court affirmed the magistrate's amended decision.

{¶ 16} Ten days later, Ted Weiner withdrew his application for an order authorizing the distribution of the Estate's remaining assets, only to file a second such application on October 13, 2005, in which he requested that the Probate Court hold "a hearing to resolve any outstanding issues * * *, with the objective of terminating the Estate." As requested, the court ordered that a hearing be held, scheduling it to begin on December 7, 2005.

---

[7] Dan moved to consolidate the cases on October 25, 2002, and we sustained his motion in our entry of June 3, 2003. Our decision, on the other hand, stated that "this court [had] sua sponte consolidated [the] appeals." *In re Estate of Weiner*, 2d Dist. Montgomery Nos. 19533 & 19564, 2003-Ohio-3408, ¶ 14.

{¶ 17} In anticipation of the hearing, Dan Weiner served a subpoena duces tecum on C. Terry Johnson—the PWMA attorney representing Ted in his capacity as executor of the Estate—on or about November 2, 2005. The subpoena instructed Johnson to appear at the hearing with his "entire file pertaining to the [E]state * * *, including but not limited to copies of all correspondence, and interoffice memorand[a]." Presumably because Dan had previously—and unsuccessfully—attempted on several occasions to obtain the same material from Johnson and PWMA, he filed a motion on November 18, 2005, asking the Probate Court to compel Johnson's compliance with the subpoena.

{¶ 18} With Dan's motion to compel pending, the hearing on Ted Weiner's second application for authority to distribute began on December 7, 2005, as scheduled. The hearing, however, was adjourned without being concluded; reconvened for a second day on January 27, 2006, for the purpose of addressing Dan's motion to compel; and adjourned again without being concluded. Further discovery disputes ensued, and the Estate moved for a protective order on March 10, 2006.[8] None of these matters had been resolved by June 1, 2006, when the parties appeared for the third day of the hearing on Ted's application. A magistrate thereafter entered a decision on June 21, 2006, requiring Ted to produce the documents implicated by Dan's motion to compel within 14 days for an inspection in camera, though the decision otherwise implicitly deferred any resolution of the discovery disputes until the inspection had been completed. Dan filed a motion on June 27, 2006, in which he offered objections to the decision.

---

[8] On February 14, 2006, Harry Weiner filed a list of documents he intended to request from PWMA. Harry had participated at times in the hearing on Dan's exceptions to the Estate's fifth account, though the foregoing was Harry's first filing.

**{¶ 19}** On August 11, 2006, the Probate Court entered an order converting the fourth day of the hearing on the application, which was scheduled for August 15, 2006, to "a [s]ettlement [c]onference." The settlement conference took place as the court had directed, though unsurprisingly, nothing was settled. For seven months after the conference, the case became effectively inactive, and nearly three years would pass before the hearing was reconvened for its fifth and final day.

**{¶ 20}** In response to Dan Weiner's motion of June 27, 2006, the Probate Court issued an order on March 14, 2007, adopting the magistrate's decision of June 21, 2006, and in addition, granting the Estate a protective order with respect "to discovery which request [sic] information prior to November 2002 and which requests attorney-client privileged information or the attorney work product [sic]."[9] Dan Weiner filed a notice of appeal from this order on April 4, 2007. We dismissed the appeal on June 26, 2007, for want of a final, appealable order.

**{¶ 21}** On January 11, 2008, following six months of further inactivity, the Probate Court scheduled a status conference for February 11, 2008. The docket does not establish whether the status conference occurred, but on March 6, 2008, Dan submitted a copy of a 2005 opinion from this court in an unrelated case, arguing that the opinion demonstrated his right to discovery of all of PWMA's records related to the Estate, irrespective of attorney-client privilege. PWMA responded on behalf of the Estate on

---

[9] The full caption of the magistrate's decision of June 21, 2006, was "Magistrate's Decision Denying Motion to Compel Discovery; Ordering In Camera Inspection of Documents[;] and Issuing Protective Order." As the Probate Court noted in its decision of March 14, 2007, the caption of the magistrate's decision was mostly inaccurate because the magistrate did not actually rule on either Dan's motion to compel or the Estate's motion for a protective order.

March 25, 2008, and Dan replied on April 15, 2008. For 14 months afterward, the case again came to a standstill.

{¶ 22} On June 10, 2009, Dan submitted objections to the Estate's proposed order for final distribution, which Ted had filed more than three years earlier in connection with his second application for authority to distribute the Estate's assets. Harry submitted his own objections on June 29, 2009, and on July 8, 2009, the parties appeared for the final day of the hearing on the second application. Dan then filed discovery requests addressed to Ted, individually and as executor, on August 4, 2009, after which the case became dormant for another year.

{¶ 23} The Probate Court broke the silence on August 3, 2010, when it cited Ted pursuant to R.C. 2109.31 for failing to file a partial account as required by R.C. 2109.301(B)(4).[10] Although Ted had not filed a partial account since he filed the Estate's fifth account on April 25, 2003, the Probate Court had granted him several extensions of time throughout 2004, and in an order issued on February 22, 2005, the court had indefinitely extended his time "pending completion of the litigation" pertaining to the fifth account. Ted nevertheless responded to the citation by filing the Estate's sixth account, optimistically captioned as the Estate's "Sixth Final and Distributive Fiduciary's Account," on August 25, 2010, as well as an application for authority to pay attorney's fees and an application for authority to pay fiduciary fees.

{¶ 24} The Estate's sixth account covered the period running from March 28, 2003,

---

[10] In relevant part, R.C. 2109.301(B)(4) states that "[a]fter [an estate's] initial account is rendered or a waiver of a partial account is filed, every * * * executor shall, at least once each year, render further accounts or file waivers of partial accounts until the estate is closed."

to May 31, 2009; listed a disbursement for attorney's fees in the amount of $263,178.31; and further listed a disbursement for fiduciary fees in the amount of $3,547.00. In the application for authority to pay attorney's fees, Ted sought permission to pay $282,353.75 to PWMA for services rendered from November 18, 2002, through June 30, 2009, and in the application for authority to pay fiduciary fees, Ted requested that he be paid $50,000.00 for his service to the Estate.[11] Dan and Harry jointly moved to strike the application for authority to pay attorney's fees on September 3, 2010; jointly filed discovery requests on September 15, 2010; and jointly submitted exceptions to the sixth account on September 20, 2010, in which they also objected to the application for authority to pay attorney's fees and the application for authority to pay fiduciary fees.

{¶ 25} Beginning on December 14, 2010, the Probate Court held a hearing on the Estate's sixth account and the related applications. The hearing concluded at the end of its sixth day, on February 25, 2011, and on July 27, 2011, a magistrate entered a decision recommending that the account and the applications be approved. In a pair of entries dated August 9, 2011, Dan and Harry were granted extensions of time in which to file objections to the magistrate's decision, with any objections being due within 30 days from the date on which the Probate Court served the parties with notice that the transcript of

---

[11] Ted's previous application for authority to pay attorney's fees was filed with the Estate's fifth account on April 25, 2003, and referred to services rendered from November 19, 2001, through October 29, 2002; presumably, PWMA did not render any billable services from October 30, 2002, through November 17, 2002. Ted's application for authority to pay fiduciary fees did not specify the period for which he sought compensation. Through the date of the application, the Estate's accounts indicated that a total of $50,000.00 had already been disbursed for payment of fiduciary fees. The Probate Court thus construed the application as a request for retroactive approval of the Estate's disbursements for fiduciary fees, which the court granted. Entry Sustaining Objections in Part and Rejecting Magistrate's Decision 23 fn.1, July 29, 2013.

the hearing had been filed.    The transcript was filed 14 months later, on October 4, 2012.

{¶ 26} Dan filed objections on November 2, 2012, and on January 18, 2013, after being granted several additional extensions of time, Harry filed objections of his own.    On July 29, 2013, the Probate Court sustained the objections in part and overruled the objections in part.    Among other things, the court overruled all of Dan's discovery-related objections; overruled Dan's exceptions to the Estate's payment of attorney's fees during the periods covered by the third, fourth and fifth accounts; approved the Estate's payment of $50,000.00 in fiduciary fees; and with respect to the application for authority to pay attorney's fees that the Estate had filed on August 25, 2010, reduced the approved amount of attorney's fees from $282,353.75 to $116,828,68.    *See* Entry Sustaining Objections in Part and Rejecting Magistrate's Decision 12-13, 17-21, 23-24 and 28-56, July 29, 2013 [hereinafter *Entry on the Sixth Account*].    The court also ordered Ted to file an amended sixth and final account in accord with its decision.

{¶ 27} On August 26, 2013, Dan filed a notice of appeal from the order, followed by the Estate on August 27, 2013, and by Harry on August 28, 2013.    All three of these appeals were dismissed for want of a final, appealable order on December 16, 2013.

{¶ 28} With the appeals dismissed, the Probate Court entered an order on March 18, 2014, requiring Ted to file the Estate's final account within 60 days.    Ted did not meet the court's deadline, but on September 2, 2014, he moved for leave to file a non-distributive final account, arguing that because objections to the final account would almost certainly be forthcoming, the Estate should be permitted to retain assets to pay attorney's fees incurred in defense of the account.    The court sustained the motion on October 30, 2014.

{¶ 29} On March 18, 2015, Ted filed the Estate's final, non-distributive account. Dan filed exceptions on April 27, 2015, and Harry filed exceptions on April 29, 2015. Harry then filed a motion on July 31, 2015, asking that the Probate Court order the Estate to pay the attorney's fees he incurred in offering objections to the magistrate's decision of July 27, 2011. The Probate Court overruled Harry's motion on August 20, 2015, and four days later, it held a hearing on the exceptions to the Estate's final account.

{¶ 30} On May 18, 2016, a magistrate entered a decision recommending that the final account be approved. The Probate Court largely adopted the magistrate's recommendations in its judgment of August 30, 2016, leaving its earlier rulings on attorney's fees undisturbed. *See* Entry Sustaining in Part and Overruling in Part the Objections to the Magistrate's Decision 24-28, Aug. 30, 2016; *compare with* Entry on the Sixth Account 24-55. Dan Weiner filed his notice of appeal on September 26, 2016, followed by Harry Weiner on September 28, 2016, and the Estate on October 7, 2016. After considerable litigation in this court, oral arguments were held on March 12, 2019.

## II. Analysis

{¶ 31} We first address the Estate's cross-assignment of error because its disposition affects the disposition of assignments of error raised by Dan and Harry Weiner. For its cross-assignment of error, the Estate contends that:

> THE TRIAL COURT ERRED BY DENYING THE ESTATE'S REQUEST FOR REASONABLE ATTORNEYS' FEES BECAUSE THE SERVICES UNDERLYING THE REQUESTED FEES ARE PART OF ESTATE ADMINISTRATION.

{¶ 32} In its application of August 25, 2010, the Estate requested authorization to

pay $282,353.75 in attorney's fees to PWMA for the period running from November 18, 2002, to May 27, 2009, as well as $10,842.00 in attorney's fees billed "for the period of July, 2008 [sic] through June 30, 2009," by another law firm, Graydon Head & Ritchey LLP. A magistrate entered a decision on July 27, 2011, recommending in relevant part that the application be approved, but in its subsequent entry, the Probate Court declined to follow this recommendation. Instead, the court authorized payment of a portion of the attorney's fees billed by PWMA between November 18, 2002, and June 22, 2005, and categorically disapproved the payment of any attorney's fees incurred between June 23, 2005, and June 30, 2009.[12] *See* Entry on the Sixth Account 28-55. According to the Estate, the court erred by refusing to grant the application in its entirety. *See* Appellee's Brief 4-5 and 14.

{¶ 33} Under R.C. 2113.36, if the executor of an estate engages an attorney to assist with the administration of the estate, then reasonable attorney's fees "paid by the executor * * * shall be allowed as a part of the expenses of administration." The probate court must consider the factors set forth in Prof.Cond.R. 1.5(a)(1)-(8) in determining whether, or to what extent, the amount to be paid by the executor is reasonable. *See* Sup.R. 71(A); *In re Estate of Kendall*, 171 Ohio App.3d 109, 2007-Ohio-1672, 869 N.E.2d 728, ¶ 16-17 (2d Dist.). These factors include the amount of the attorney's time required; the difficulty of the issues presented; the expertise required of the attorney; the extent to

---

[12] Ruling on the objections of Dan and Harry Weiner to the magistrate's recommendation, the Probate Court sustained the objections to the extent that they related "to the approval of [any] attorney's fees incurred between November 2, 2002, and June 30, 2009, that [were] not specifically approved [by the court] in [the] Entry." Entry on the Sixth Account 54-55. The court, however, did not specifically approve any attorney's fees incurred before November 18, 2002, or after June 22, 2005. *See id.* at 24-54.

which the attorney could not accept other employment while engaged by the executor; the fee customarily charged for similar services in the locality; the amount billed to the estate by the attorney; the results actually obtained by the attorney; the time limitations, if any, imposed by the executor or by the circumstances; the nature and duration of the attorney's professional relationship with the executor; the attorney's experience, reputation and ability; and whether the attorney's fee is fixed or contingent. *See* Prof.Cond.R. 1.5(a)(1)-(8); *Estate of Kendall* at ¶ 17.

{¶ 34} The decision whether to approve or disapprove an estate's payment of attorney's fees is within the "probate court's sound discretion." *In re Estate of Davidson*, 2d Dist. Montgomery No. 22943, 2009-Ohio-3014, ¶ 30, citing *Estate of Kendall* at ¶ 25; *see also In re Estate of Brady*, 8th Dist. Cuyahoga No. 88107, 2007-Ohio-1005, ¶ 18; *In re Estate of Lazar*, 11th Dist. Geauga No. 2003-G-2509, 2004-Ohio-1964, ¶ 15; *In re Estate of Fugate*, 86 Ohio App.3d 293, 298, 620 N.E.2d 966 (4th Dist.1993). Thus, we employ the abuse-of-discretion standard for our review of the Probate Court's rulings. *Id.* A court abuses its discretion when it exercises its authority in an unreasonable, unconscionable or arbitrary manner. *See, e.g., Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983); *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7, citing *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1995); *Lindsey v. Sinclair Broadcast Group, Inc.*, 2d Dist. Montgomery No. 19903, 2003-Ohio-6898, ¶ 19.

{¶ 35} In the Entry on the Sixth Account, the Probate Court characterized the withdrawal of the Estate's first application for authority to distribute on June 30, 2005, as "the beginning of [Ted Weiner and PWMA's] efforts to obtain [attorney's] fees incurred in

litigating" the Estate's fifth account, in which Ted and PWMA had already "sought [recovery of the attorney's] fees incurred in administering the Estate." Entry on the Sixth Account 54. Thus, the court determined that the "fees incurred from that point forward [were] 'fees on fees on fees,' or [in other words,] a second regression of * * * litigation" over attorney's fees. *Id.* The court deemed "these 'fees on fees on fees' [to be] unreasonable from the Estate's perspective" because the filing of the first application for authority to distribute, the filing of the second application for authority to distribute, and the filing of the proposed order for final distribution "resulted in additional discovery disputes and hearings, further complicating and delaying * * * the closing of the Estate" for "another ten years." *Id.* Worse still, in the court's view, "[t]he eventual withdrawal of each of these filings rendered them and their associated disputes and hearings duplicative and of minimal value, given that the [f]inal [a]ccount and [f]ee [a]pplications resulted in disputes and hearings covering virtually the same ground." *Id.*

{¶ 36} We find that the Probate Court unreasonably disregarded the circumstances by characterizing the entirety of Ted and PWMA's activity, onward from the withdrawal of the application, as devoted solely to the collection of fees. In the application, Ted Weiner requested that the court hold a hearing "to resolve all outstanding issues with the Estate," including Dan Weiner's then-pending objections to the Estate's fifth account, "as prelude to [the] filing of [a] [f]inal account." Estate's First Application to Distribute Assets 1, Jan. 22, 2004. Taken at face value, the filing of the application appears to have been a worthwhile effort to hasten the closure of the Estate, rather than an effort to generate attorney's fees by instigating further litigation, and the withdrawal of the application was prompted by a change in the posture of the case—specifically, the

entry of the court's decision on Dan Weiner's exceptions to the fifth account.[13]   The court, moreover, never acted on the application, which in any event produced no additional litigation.

**{¶ 37}** Like the filing of the first application, the filing of the Estate's second application for authority to distribute assets on October 13, 2005, appears to have been a worthwhile attempt to close the Estate, although the proposed order for final distribution filed on January 13, 2006, included a dubious provision related to "the Estate's stated intention to pursue" recovery of attorney's fees incurred as the result of the alleged "misconduct of Dan Weiner."   Estate's Proposed Order of Distribution, Ex. A, Jan. 13, 2006; Transcript of Hearing on Estate's Second Application for Distribution of Assets 9-10, July 8, 2009.   The provision in question would have authorized the Estate to withhold "Dan Weiner's one-third share of the Estate's assets" until the expiration of the time in which "any post-distribution motions [and] appeals" could have been filed, or alternatively, until "any such motions [and] appeals" had been adjudicated.   Estate's Proposed Order of Distribution, Ex. A.

**{¶ 38}** Unlike the filing of the first application, the filing of the second application did lead to further litigation, and the Probate Court acted on the application by ordering a hearing, which was referred to a magistrate.   The hearing, spread over five days, produced a surfeit of strutting and fretting, but it ultimately accomplished nothing.   On the first day, the magistrate could not address the substance of the application because

---

[13]  Had the application been granted, the result would have been a final, appealable order, and the issuance of a final, appealable order in 2004 or 2005 would likely have forced an end to the litigation many years ago.   *See* R.C. 2109.36 (stating that a probate court's "order of distribution shall have the effect of a judgment").

PWMA had failed to attach the necessary exhibits. In addition, PWMA reported that it had inadvertently accepted a payment of fees from the Estate before the Probate Court formally approved the payment.[14] The second day of the hearing was devoted to pending discovery issues, instead of the application itself; the third day amounted to little more than a status and scheduling conference; the fourth day was devoted, by order of the court, to a predictably fruitless settlement conference.

{¶ 39} Forty-three months after it began, the hearing ended on July 8, 2009—its fifth day—with nothing resolved. The Probate Court had failed to serve notice of the hearing on Ted Weiner, who therefore did not appear, and an attorney with PWMA, who was a key witness, could not appear as the result of illness. Moreover, PWMA had not submitted a corresponding application for payment of its attorney's fees. Transcript of Hearing on Second Application for Authority to Distribute 9-10, July 8, 2009. Although the Probate Court indicated that the second application, like the first, was later withdrawn, the docket includes no formal notice of withdrawal, and the court itself did not enter a formal decision on the application.

{¶ 40} We find that the filing of the second application was theoretically reasonable from the Estate's perspective, but the question of whether PWMA should be paid the full amount of the fees it billed in connection with the application is another matter. The firm, for example, repeatedly failed to submit necessary documentation in support of the application, and its performance throughout the hearing on the application was not wholly

---

[14] This discrepancy was later rectified. *See* Transcript of Hearing on Second Application for Authority to Distribute 30-32, June 1, 2006; Transcript of Hearing on Second Application for Authority to Distribute 62-66, July 8, 2009.

above reproach.

**{¶ 41}** Nevertheless, we find further that the Probate Court erred by summarily denying authorization for the Estate to pay any of PWMA's fees incurred after June 22, 2005, without reviewing the nature of the services for which those fees were claimed or the circumstances in which the services were rendered. Even assuming that some or most of such services were not purely related to the administration of the Estate, the Probate Court unfairly absolved Dan and Harry of their responsibility for the protracted, redundant litigation over attorney's fees and discovery. Furthermore, with all due respect to the court, we note that its ruling on attorney's fees incurred after June 22, 2005, does not account for administrative issues, such as turnover among court personnel, the intermittent omission of service of notice of proceedings on all parties, and delays in the completion of hearings.

**{¶ 42}** Dan and Harry's dogged pursuit of litigation against the Estate, coupled with an inconsistent administrative response, left Ted and PWMA with two options, both of which presented potential problems. First, they could have declined to participate actively in the litigation after a certain date, hoping that any exceptions or motions filed subsequently by Dan and Harry would not be sustained by default; or, second, they could have chosen to continue with the litigation, hoping to close the Estate through a proceeding that would yield a final, appealable order. Many executors and their attorneys might view the former option, whether rightly or wrongly, as less than true to the spirit of Prof.Cond.R. 1.3 and, perhaps, as posing a risk of malpractice liability, though in this case, it would doubtless have resulted in lower fees. On the other hand, many executors and their attorneys might view the latter option, whether rightly or wrongly, as

a professional obligation, though it led the Estate to incur fees that, to some extent, were potentially avoidable. PWMA, at times, failed to capitalize on opportunities to close the Estate, yet such failures notwithstanding, the entirety of the Estate's participation in the litigation in this case after June 22, 2005, cannot fairly be characterized as exclusively the pursuit of "fees, on fees, on fees," even though the dispute over attorney's fees was the most contentious of the parties' disputes, or at any rate, the longest-lived.

{¶ 43} Strictly as it relates to the categorical denial of authorization to use assets of the Estate to pay attorney's fees incurred after June 22, 2005, by Ted Weiner, as executor, we sustain the Estate's cross-assignment of error in part and remand this case to the Probate Court; otherwise the Estate's cross-assignment of error is overruled in part. On remand, the court must evaluate all services that were rendered after June 22, 2005, and on or before June 30, 2009, indicating in each instance the reason for which payment is authorized or not authorized, whether in part or whole. Having already held a hearing and received evidence on these fees, the court, in its discretion, may determine that no further hearing or submission of evidence is necessary.

{¶ 44} For the first of his two assignments of error, Harry Weiner contends that:

THE TRIAL COURT ERRED IN ALLOWING PAYMENT OF ATTORNEY FEES THAT WERE NOT REASONABLE, NECESSARY, OR FOR THE BENEFIT OF THE ESTATE.

{¶ 45} Harry argues that all, or nearly all, of the time billed by PWMA represented work that did not benefit the Estate, which he maintains "should have been closed in 2000." *See* Brief of H.Weiner 11-12. In Harry's accounting, PWMA spent its time either on matters "unrelated to [the] administration [of the Estate]," such as the wrongful death

lawsuit instituted by Dan Weiner and the release sought by Ted Weiner, or "defending [its] own fees." *See id.* at 6-10 and 14-18. Accordingly, Harry asks that the Probate Court's judgment of August 30, 2016, be reversed to the extent that it incorporated that part of the Probate Court's earlier Entry on the Sixth Account in which the court approved payment of some of the attorney's fees billed to the Estate by PWMA. *Id.* at 23; *see also* Entry on the Sixth Account 24-55.

{¶ 46} Harry adds that he does "not object to <u>all</u> of [the] attorney['s] fees [incurred by Ted Weiner], [but] only to those [fees for services] that did not benefit the [E]state." (Emphasis in original.) *See, e.g.*, Brief of H.Weiner 22. Even so, Harry reasons that because the Estate "should have been closed in 2000," the Probate Court erred by approving payment of any attorney's fees billed after that date, or at the latest, after March 26, 2001.[15] *See id.* at 11-12. Billing for dates subsequent to March 26, 2001, in Harry's opinion, "was all [for] time spent [by PWMA] defending [its] fees." *See id.* He directs his request for relief, however, only to the foregoing provisions of the Entry on the Sixth Account. *Id.* at 23.

{¶ 47} In the first part of his argument, Harry faults the Probate Court for authorizing payment of PWMA's fees specifically for work related to the wrongful death lawsuit instituted by Dan, because an "attorney['s] time spent in pursuit of or ancillary to

---

[15] Ted offered to resign as executor in his letter to Dan of March 26, 2001. Harry remarks earlier in his brief that the Estate could have been closed in April 2002, at which point the "administration work [was] already completed for $6,247.00" in attorney's fees. Brief of H.Weiner 13. Harry might have meant that the corresponding services were of benefit to the Estate. *But see id.* at 10 (stating that after June 20, 2000, when Dan was replaced by C. Terry Johnson as counsel for Ted in his capacity as executor, "time entries began to appear [for work] related to [the] [E]state's business," but "by that time, the majority of the work necessary for the administration of the [E]state was done").

a wrongful death claim is not chargeable to [the decedent's] estate."  *See id.* at 6.  This proposition is not necessarily a correct statement of the law.

**{¶ 48}** An "iron-clad rule[,] other than the [rule] that [the] reasonable value [of an attorney's services] must be substantiated by the evidence," is "impossible" to enforce because the "facts and circumstances vary so much from case to case."  *In re Love's Estate*, 1 Ohio App.2d 571, 579, 206 N.E.2d 39 (10th Dist.1965).   In place of an invariably applicable rule, a probate court is invested with "sole discretion" to authorize the use of an estate's assets for "[t]he payment of reasonable attorney['s] fees."  *See In re Keller*, 65 Ohio App.3d 650, 655-656, 584 N.E.2d 1312 (8th Dist.1989).   The "only limitation is that the attorney's services [must be] beneficial to the estate."  *See In re Estate of Coleman*, 55 Ohio App.3d 261, 262, 564 N.E.2d 116 (6th Dist.1988).

**{¶ 49}** Moreover, if "the executor of an estate * * *, being under no obligation to participate in litigation involving principally the interests of the beneficiaries under the will," chooses to participate "at the request of [the] beneficiaries in order to protect their interests," then the executor "is entitled to compensation for extraordinary services." *Doty v. Peters*, 106 Ohio App. 435, 155 N.E.2d 239 (12th Dist.1958), paragraph four of the syllabus; *see* R.C. 2113.36; *see also, e.g.*, Uniform Probate Code (1987), Section 3-720 (stating that a "personal representative [who] defends or prosecutes any proceeding in good faith[,] whether successful or not," is entitled to payment "from the estate" of the "necessary expenses and disbursements[,] including reasonable attorney's fees").   In this case, the beneficiaries of the Estate and the prospective beneficiaries of the wrongful death lawsuit were the same three persons: Dan Weiner, Harry Weiner and Ted Weiner. Dan requested authorization to commence the lawsuit in Ted's name, and when Ted

refused, Dan simply proceeded in Ted's name without authorization.

{¶ 50} Regardless of whether Harry has presented a cognizable challenge to the Probate Court's approval of such fees—most of which were incurred before November 18, 2002—we find that the Probate Court did not abuse its discretion by approving the Estate's payment of attorney's fees to PWMA for the firm's work in relation to the lawsuit.[16] As executor of the Estate, Ted Weiner was Joey Weiner's personal representative. Although he did not have an affirmative obligation, as executor, to participate in the lawsuit on behalf of the Estate, he did have the option to involve the Estate at Dan's request inasmuch as the "litigation involv[ed] principally the interests of the beneficiaries under [Joey Weiner's] will." *See Doty* at paragraph four of the syllabus. Ted's eventual decision to dismiss the lawsuit makes no difference; he cannot have had an affirmative obligation to pursue claims for relief that were unsupported by the available evidence or otherwise lacked merit. *See* Entry and Order 1, Aug. 6, 2002. Thus, the Probate Court's approval of fees related to the lawsuit was neither contrary to law, nor in disregard of the evidence.

{¶ 51} In the second part of his argument, Harry attempts to illustrate generally that none of PWMA's work benefitted the Estate. *See* Brief of H.Weiner 9-17. He suggests that because "the majority of the work necessary for the administration of the [E]state" was completed before Ted engaged PWMA to replace Dan, the services provided by PWMA—particularly those provided after March 26, 2001—were unnecessary. *See id.* at 10-11.

---

[16] As noted, Harry formally requests the reversal of only that part of the Entry on the Sixth Account in which the Probate Court approved a portion of PWMA's fees for the period running from November 18, 2002, to June 30, 2009.

**{¶ 52}** On review of the Estate's cross-assignment of error, however, we have found that the Probate Court did not abuse its discretion with respect to its approval of the majority of the fees billed by PWMA for the period running from November 18, 2002, through June 22, 2005. The court reviewed the fees in question under the correct legal standard and accurately cited the record in support of its conclusions pursuant to that standard. Harry simply disagrees with the court's application of the law, arguing in effect that the court construed the concepts of "necessity" and "benefit" too liberally. *See* Brief of H.Weiner 10-17; *see also* Entry Sustaining Objections in Part and Rejecting Magistrate's Decision 24-26.

**{¶ 53}** Likewise, we find that the Probate Court did not abuse its discretion by authorizing the payment of attorney's fees incurred before November 18, 2002. Harry argues that the Estate should not have been authorized to pay PWMA's fees for answering "questions Ted had concerning certain joint and survivor accounts in his mother and Dan's name[,] [or for providing] an analysis of law concerning undue influence." Brief of H.Weiner 10. Yet, as executor, Ted had the duty, among others, "to marshal the assets of the decedent," making his inquiries reasonable, even if not absolutely necessary, from the Estate's perspective. *Reinhard v. Peck*, 159 Ohio St. 116, 121, 111 N.E.2d 262 (1953); *see also Long v. Long*, 11th Dist. Trumbull No. 2007-T-0047, 2007-Ohio-5909, ¶ 47, citing *Reinhard* at 121.

**{¶ 54}** Harry also argues that "[n]one of the work" itemized in the Estate's application of June 26, 2001, for authorization to pay attorney's fees "was time spent on behalf of the [E]state or in assisting the executor to discharge his fiduciary duties." Brief of H.Weiner 10. Apart from the foregoing inquiries, the application lists services

rendered for the preparation of the Estate's second account, the substitution of Dan Weiner as counsel for the executor, and the withdrawal of the wrongful death lawsuit commenced by Dan. This was certainly "time spent * * * assisting the executor [with the] discharge [of] his fiduciary duties," and as executor, Ted had the discretion to replace Dan. *Id.* Furthermore, we have determined that the Estate's assets could properly be used to compensate PWMA for its work on the lawsuit. We find, then, that Harry has not offered any meritorious objections to the attorney's fees incurred by Ted, as executor of the Estate, before November 18, 2002, assuming for sake of analysis that Harry has presented a cognizable challenge to such fees.[17]

{¶ 55} In the third and final part of his argument, Harry discusses Ted's conditional offer to resign as executor, and to consent to Dan's appointment, in exchange for a release of liability. *See* Brief of H.Weiner 18-21. Harry criticizes the Probate Court's approval of PWMA's fees in this respect because Ted sought the release "for his personal benefit," and not for the benefit of the Estate as a whole. *Id.* at 18. As well, Harry emphasizes that, pursuant to the terms of the proposed release, he and Dan would have been required not only to release Ted from liability arising from the management of the Estate, but also to indemnify Ted against such liability, even though the Probate Court's entry of August 6, 2002, stated that Ted had "had cause to demand a written release prior to stepping down as [e]xectuor," not that Ted had had cause to demand a written indemnification agreement. *Id.* at 20; Entry and Order 2, Aug. 6, 2002. In plain language, Harry accuses Ted of "attempt[ing] to leverage his position by refusing to close the [E]state" until the release was executed. Brief of H.Weiner 19.

---

[17] *See* note 16.

{¶ 56} Assuming for sake of analysis that Harry's request for relief encompasses the approval of such fees, we find that the Probate Court did not abuse its discretion.[18] The Probate Court issued its entry of August 6, 2002, in response to "the motion of <u>Dan D. Weiner</u> for [the] removal of Ted Weiner" as executor of the Estate. (Emphasis added.) Entry and Order 1, Aug 6. 2002. In his motion, Dan stated that Ted should be removed for "refus[ing] to re-file the [w]rongful [d]eath action," and in his memorandum in support, Dan argued that if the original "lawsuit had not been timely filed, [he] as [a]ttorney for the Estate would have subjected Ted * * *, as [e]xecutor, to <u>a probable lawsuit by the heirs and next of kin</u> for fail[ing] to * * * protect their legal rights under the wrongful death statute." (Emphasis added.) Motion of D.Weiner for Removal of T.Weiner 1, June 10, 2002; Memorandum of D.Weiner in Support of Motion for Removal of T.Weiner 2, July 9, 2002. Given that Dan, Harry and Ted would have been the exclusive beneficiaries of the proceeds of a wrongful death action, Dan effectively represented to the Probate Court that he and Harry were planning to sue Ted for refusing to proceed with the lawsuit. Memorandum of D.Weiner in Support of Motion for Removal of T.Weiner 2; *see also* R.C. 2125.02(A)(1) (indicating that an action for wrongful death is "for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent").

{¶ 57} Furthermore, rather than refusing to close the Estate until the release was executed, Ted simply exercised his right to remain executor, as designated by Joey Weiner in her will. Harry complains, regardless, that "Ted had no right to demand" indemnification from him for "any action which Dan might [have brought]." Brief of H.Weiner 20. Yet, Ted had no obligation to resign, and despite the fact that Ted's

---

[18] *See* note 16.

proposed release included indemnification provisions not expressly endorsed by the Probate Court, Harry fails to demonstrate that the provisions were incompatible with the Probate Court's entry and order, or that Ted somehow violated the entry and order merely by proposing the provisions. The proposed provisions, for that matter, would have required each of the heirs to indemnify both of the others, meaning that the release would not have favored any individual heir to the detriment of the other two. In essence, PWMA's work on the release was a defense of Joey Weiner's choice of executor, and because the successful defense of a decedent's choice of executor is beneficial to the decedent's estate, the Probate Court neither committed an error of law nor disregarded the evidence by approving the payment of PWMA's fees with respect to the release, particularly in the absence of any citation to the record demonstrating that the fees were unreasonable in terms of the amount of hours billed, the hourly rate, or any other criterion set forth in Prof.Cond.R. 1.5(a)(1)-(8). *See Goff v. Key Trust Co. of Ohio*, 8th Dist. Cuyahoga No. 71636, 1997 WL 781793, *3 (Dec. 18, 1997).

{¶ 58} We find that the Probate Court did not abuse its discretion by authorizing the Estate to pay PWMA for its services related to the wrongful death lawsuit instituted by Dan Weiner; for its services rendered from its initial engagement through June 22, 2005; or for its services with respect to the release of liability proposed by Ted Weiner. Harry's first assignment of error is overruled.

{¶ 59} For his second assignment of error, Harry Weiner contends that:

THE TRIAL COURT ERRED IN DENYING HARRY WEINER'S REQUEST FOR ATTORNEY FEES[.]

{¶ 60} Here, Harry argues that the Probate Court should have ordered the Estate

to pay the attorney's fees he incurred for his filing of January 18, 2013, in which he raised objections to the magistrate's recommendation of July 27, 2011, that the Probate Court approve the payment of the full amount of attorney's fees stated in PWMA's application of August 25, 2010.[19]   Brief of H.Weiner 21.   He implies that he is solely responsible for convincing the Probate Court to authorize only a portion of the attorney's fees sought by PWMA.   *Id.* at 21-22 (referring to the Probate Court's decision of July 29, 2013).

**{¶ 61}** Our finding that the Probate Court abused its discretion by categorically disallowing the payment of any of PWMA's fees incurred after June 22, 2005, renders this assignment of error moot.   Even otherwise, Harry's argument disregards the fact that the objections he raised in his filing of January 18, 2013, were largely duplicative of the objections Dan had raised in his filing of November 2, 2012, which means that the Probate Court's refusal to authorize payment of the full amount of PWMA's application of August 25, 2010, is not necessarily traceable to Harry's objections of January 18, 2013.   Harry's second assignment of error is overruled.

**{¶ 62}** For his first assignment of error, Dan Weiner contends that:

THE PROBATE COURT ERRED BY DENYING DAN DISCOVERY OF DOCUMENTS ON THE CLAIM OF ATTORNEY CLIENT AND/OR WORK PRODUCT PRIVILEGE.

**{¶ 63}** Dan requested production of an exhaustive array of documents in support of his objections to the Estate's payment of attorney's fees to PWMA.   *See, e.g.*, Brief of D.Weiner 6-11.   Here, Dan refers to the documents listed on "the Weiner Estate Privilege Log," arguing, alternatively, that all of these documents should have been subject to

---

[19]  The application covered the period running from November 18, 2002, to June 30, 2009.

discovery: (1) because Ted expressly waived attorney-client privilege "by testifying on the issue of * * * attorney's fees"; (2) because Ted's applications for permission to pay PWMA's fees from the Estate's assets constituted an implied waiver; or (3) because the filing of objections to the Estate's payment of attorney's fees constituted good cause for discovery of the documents, privilege notwithstanding. *See* Brief of D.Weiner 1 and 14-15.

{¶ 64} Aside from his reference to the Weiner Estate Privilege Log, which lists 317 documents, Dan has not specified exactly which of the documents listed in the log were disclosed to him in discovery and which were not, but a cursory inspection of the log suggests that many of the documents were actually disclosed, at least in redacted form— for example, the first listing in the privilege log is "[i]temized [b]reakdown of [h]ours and [t]otals," of which several copies appear in the record. The log likewise lists the firm's invoices, all or nearly all of which appear to have been attached to the Estate's applications for authorization to pay attorney's fees, as well as correspondence directed to Dan himself.

{¶ 65} We find, as a result, that Dan has not satisfied his burden on appeal to demonstrate error on the part of the Probate Court because he has not specified which of the documents, or portions thereof, in the Weiner Estate Privilege Log were improperly deemed by the court to be subject to privilege, or for that matter, which of his requests for production were improperly deemed to relate to privileged materials. *See generally* App.R. 16(A)(7); *Camp v. Star Leasing Co.*, 10th Dist. Franklin No. 11AP-977, 2012-Ohio-3650, ¶ 67 (noting that an "appellant bears the burden of affirmatively demonstrating error on appeal"); *see also* Transcript of Hearing on Second Application for Authority to

Distribute 16-22, June 1, 2006. Even otherwise, Dan's arguments lack merit. The statutory attorney-client privilege may be waived only expressly, and not by implication, but assuming for sake of analysis that Ted Weiner expressly waived the statutory privilege to permit PWMA to testify regarding the value of its fees, the scope of the waiver would have been limited to the same subject—that is, the nature of the fees themselves—rather than applying indiscriminately to all work product or attorney-client communications between Ted and PWMA. *See, e.g.*, R.C. 2317.01(A)(1); Civ.R. 26(B); *Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469, 937 N.E.2d 533, ¶ 18-21, 33-40 and 54-60; *Zimpfer v. Roach*, 2017-Ohio-8437, 99 N.E.3d 1169, ¶ 28-37 (3d Dist.); *Hollingsworth v. Time Warner Cable*, 157 Ohio App.3d 539, 2004-Ohio-3130, 812 N.E.2d 976, ¶ 63-65 (1st Dist.).

{¶ 66} Similarly, with respect to the work-product exception to the attorney-client privilege, Dan bore the burden to establish his need for the documents he sought, meaning that he had to demonstrate that they were relevant to the issue of PWMA's fees and were otherwise unavailable to him. *Squire, Sanders & Dempsey* at ¶ 56-57, citing *Jackson v. Greger*, 110 Ohio St.3d 488, 2006-Ohio-4968, 854 N.E.2d 487, ¶ 16; *see also* Civ.R. 26(B). Given the considerable quantity of documents produced to Dan after the magistrate's in camera inspection of PWMA's files, the record of this case provides no support for a finding that the Probate Court erred by failing to consider whether any documents not produced were relevant and otherwise unavailable. For all of the foregoing reasons, Dan's first assignment of error is overruled.

{¶ 67} For his second assignment of error, Dan Weiner contends that:

THE PROBATE COURT ERRED AS A MATTER OF LAW AND/OR

ABUSED ITS DISCRETION WHEN IT FOUND THAT THE EXECUTOR COULD REFUSE TO CLOSE THE ESTATE UNTIL THE BENEFICIARIES EXECUTED A RELEASE WHEN THE DEMANDED RELEASE ALSO INCLUDED INDEMNIFICATION, CONTRARY TO PUBLIC POLICY.

**{¶ 68}** On June 10, 2002, Dan moved the Probate Court under R.C. 2113.18 to remove Ted from his position as executor for "refus[ing] to re-file the [w]rongful [d]eath action in the Montgomery County Common Pleas Court[,] although [asked] to do so." Application for Removal of Fiduciary 1, June 10, 2002. Following a hearing, Judge Gounaris overruled the motion in a decision filed on August 6, 2002. Judge Gounaris found, among other things, that Ted "had cause to demand a written release prior to stepping down as [e]xectuor" because Dan "had threatened to sue [Ted] on numerous occasions." Entry and Order 2, Aug. 6, 2002.

**{¶ 69}** Despite the apparent implication of his assignment of error, Dan actually argues that the Probate Court erred in its entry of July 29, 2013, by finding that the issue of the release was res judicata as a result of this court's opinion affirming the decision entered by Judge Gounaris. Brief of D.Weiner 16-17; *see also In re Estate of Weiner*, 2d Dist. Montgomery Nos. 19533 & 19564, 2003-Ohio-3408, ¶ 10-17. Dan maintains that because "the parties never fully and actually litigated the issue" of the release before the Probate Court, our decision had no "preclusive effect" because the issue of the release was beyond the scope of his appeal. Brief of D. Weiner 17-18. He also argues that our earlier opinion was not dispositive because we based the holding "solely on [his] failure to obtain a transcript of the hearing" on his motion for Ted's removal, rather than on a review of the merits of Judge Gounaris's decision. *Id.* at 18.

{¶ 70} We find that these arguments lack merit.   The record establishes that Ted requested a release of liability in exchange for his voluntary resignation as executor, not as a condition precedent for closing the Estate.   *See* Entry and Order 1-2, Aug. 6, 2002; Exceptor's Exhibit 9, Sept. 10, 2003.   As we have observed, Ted's mere proposal of the indemnification provisions, which Judge Gounaris did not address, was not of itself a violation of the law or otherwise improper, and for that matter, Ted would have been obligated to indemnify Dan and Harry.

{¶ 71} In any event, our earlier opinion is dispositive, irrespective of the fact that we relied on Dan's failure to meet his burden on appeal.   *See, e.g.*, App.R. 10(A); *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199-200, 400 N.E.2d 384 (1980).   Dan's second assignment of error is overruled.

{¶ 72} For his third assignment of error, Dan Weiner contends that:

> THE PROBATE COURT ERRED WHEN IT AWARDED ATTORNEY FEES WITHOUT DETERMINING WHETHER THE FEES WERE INCURRED FOR THE BENEFIT OF THE ESTATE.

{¶ 73} Dan argues that the Probate Court erred by authorizing the payment of the attorney's fees reflected in the Estate's fifth and sixth accounts, which were "not beneficial to the [E]state."   Brief of D.Weiner 20.   Our disposition of the Estate's cross-assignment of error, however, resolves this issue.   Dan's third assignment of error is overruled.

{¶ 74} For his fourth assignment of error, Dan Weiner contends that:

> THE PROBATE COURT ERRED BY DENYING DAN WEINER HIS CONSTITUTIONAL DUE PROCESS RIGHTS DURING THE SIXTH ACCOUNT EXCEPTION HEARINGS.

**{¶ 75}** Finally, Dan argues that the Probate "Court violated [his] constitutional rights to due process by, inter alia, failing to bring the boxes containing the record as promised; curtailing his cross[-]examination of Mr. Hallinan[, an attorney with PWMA]; impeding his cross[-]examination of Ted because [he] did not have sufficient copies of the exhibits, even though a projector was available to display the exhibits * * *; and refusing to admit relevant and probative exhibits." Brief of D.Weiner at 24. We find that this argument has no merit.

**{¶ 76}** The Probate Court, like all trial courts, had "the inherent power to regulate the practice before it and [to] protect the integrity of its proceedings." *Royal Indem. Co. v. J.C. Penney Co., Inc.*, 27 Ohio St.3d 31, 33-34, 501 N.E.2d 617 (1986), citing *D.H. Overmyer Co. v. Robson*, 750 F.2d 31 (6th Cir.1984), *and Smith v. Brock*, 532 P.2d 843 (Okla.1975). Regardless of whether the Probate Court gratuitously promised to provide Dan with copies of items already on record, the court had no such obligation as a matter of law, and its alleged failure to provide copies of items on record does not constitute a violation of Dan's right to due process. Having reviewed the transcript of the court's hearing on the exceptions to the Estate's sixth account, we find that the court reasonably limited Dan's cross-examination to relevant matters, and that the court reasonably expected Dan to provide copies of exhibits he intended to introduce for the court itself and opposing counsel, as well as for any witnesses he intended to examine using such exhibits. Furthermore, despite Dan's assertion that he was prevented from "fully litigating" the attorney's fees reflected in the Estate's third and fourth accounts, he did have "the opportunity to elicit testimony and present evidence" in support of his exceptions to those accounts "at the hearing on [his objections to] the [f]ifth [a]ccount," as

the court observed in its decision of July 29, 2013. Entry on the Sixth Account 20-21; Brief of D.Weiner 24.

**{¶ 77}** Most importantly, Dan has not demonstrated that he was prejudiced by the Probate Court's regulation of the proceedings. *See, e.g.*, *Blevins v. Blevins*, 2d Dist. Greene No. 2018-CA-23, 2019-Ohio-297, ¶ 36-37. Dan's fourth assignment of error is overruled.

### III. Conclusion

**{¶ 78}** Regarding attorney's fees incurred by Ted Weiner, as executor, we find that the Probate Court erred when it summarily denied authorization for the Estate to pay any attorney's fees incurred after June 22, 2005; otherwise, we affirm the court's rulings on the Estate's payment of attorney's fees. We find further that the Probate Court did not err by overruling Harry Weiner's application for payment of his attorney's fees or by finding that Ted Weiner could demand a release of liability in exchange for his voluntary resignation as executor of the Estate. Finally, we find that Dan has not met his burden on appeal to demonstrate that the Probate Court erred in its resolution of his discovery disputes with the Estate, and that the court did not violate Dan's right to due process at the hearing on the exceptions to the Estate's sixth account.

**{¶ 79}** The Probate Court's final judgment of August 30, 2016, is therefore affirmed in part and reversed in part, and the case is remanded to the court for further proceedings consistent with this opinion. As a matter of law, all rulings made previously by the court were merged into the final judgment upon its entry. Consequently, with the exception of the single issue to be considered by the court on remand, the court is divested of the ability to review or reconsider any questions of law or fact on which it has not been

reversed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies sent to:

David P. Williamson
Justine Z. Larsen
Dan D. Weiner
Robin D. Miller
Hon. Alice O. McCollum